UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

JOSHUA SCHUYLER MASON, M.D.,

**Case No. 18-CV-05864**

**COMPLAINT**

Plaintiff,

**JURY TRIAL
DEMANDED**

- v -

NEW YORK UNIVERSITY, NYU LANGONE
HOSPITALS, NYU LANGONE HEALTH
SYSTEM, NYU LANGONE MEDICAL
CENTER, NYU SCHOOL OF MEDICINE,
NYU MEDICAL CENTER,  NYU HOSPITALS
CENTER, NYU LANGONE HOSPITAL –
BROOKLYN, and NYU PULMONARY &
CRITICAL CARE ASSOCIATES,
LUTHERAN,

Defendants.

-----------------------------------------------------------------x


Plaintiff JOSHUA SCHUYLER MASON, M.D., through his attorneys,

Risman & Risman, P.C. and Watkins Law, brings this action against Defendants

NEW YORK UNIVERSITY, NYU LANGONE HOSPITALS, NYU LANGONE

HEALTH SYSTEM, NYU LANGONE MEDICAL CENTER, NYU SCHOOL OF

MEDICINE, NYU MEDICAL CENTER, NYU HOSPITALS CENTER, NYU

LANGONE HOSPITAL – BROOKLYN, and NYU PULMONARY & CRITICAL

CARE ASSOCIATES, LUTHERAN,  to redress Defendants' violation of Plaintiff's rights under New York Labor Law § 741 by terminating his employment because Plaintiff had complained about improper patient care, Defendants' defamation of Plaintiff by, weeks after terminating Plaintiff's employment, filing a report with the Office of Professional Medical Conduct, falsely claiming that the he was terminated due to failing to respond to a patient in a timely matter, as well as for causing Plaintiff to be compelled to repeat the defamatory statement, leading to self-publication defamation.

## PARTIES

1. On or about April 1, 2016, Plaintiff Joshua Schuyler Mason, M.D (hereinafter referred to as "Dr. Mason" or "Plaintiff"), was offered a position by Defendant NYU School of Medicine, an administrative division of Defendant New York University, and a component of Defendant NYU Langone Medical Center, an academic medical center comprised of the Defendant NYU School of Medicine and Defendant NYU Hospitals Center, whose successor corporation is now called Defendant NYU Langone Hospitals and Defendant NYU Langone Health Systems. Dr. Mason was to provide clinical services predominantly at Defendant NYU Langone Hospital – Brooklyn (hereinafter referred to as "NYU – Brooklyn" or

"NYU Lutheran") to be employed at NYU Pulmonary & Critical Care Associates, Lutheran as a Clinical Instructor of Medicine, at the division of Pulmonary, Critical Care and Sleep Medicine at NYU - Brooklyn.   All the aforementioned Defendants are collectively referred to as "Defendants NYU," "NYU" or "Defendants."

2. On or about April 18, 2016, Dr. Mason accepted the position offered by NYU.

3. Dr. Mason served as a Pulmonary and Critical Care Specialist with a title of Clinical Instructor of Medicine, who predominantly performed his duties in the Intensive Care Units, comprised of the Medical Intensive Care Unit ("MICU") and the Intermediate Intensive Care Unit (also known as the Step-down ICU or "IICU") (the MICU and IICU are collectively referred to as the "ICU"), predominantly working at NYU – Brooklyn.

4. Defendant New York University is a private university comprised of numerous schools and colleges, including the School of Medicine and its principal place of business is located at 70 Washington Square South, New York, New York 10012.

5. Upon information and belief, Defendant NYU School of Medicine, is part of the New York University Medical Center, also known as the NYU Langone Health Systems,   a division of New York University, and has its principal place of

business located at 530 First Avenue, New York, New York 10016.

6. Upon information and belief, Defendant NYU Langone Hospitals is the successor corporation of NYU Hospital Center and is a Domestic Not-For-Profit Corporation located at 550 First Avenue, in New York,  New York.  It may sue and be sued.

7. Upon information and belief, Defendant NYU Langone Health Systems is a Domestic Not-For-Profit Corporation located at 550 First Avenue, in New York, New York.  It may sue and be sued.

8. Upon information and belief, Defendant NYU – Brooklyn is a hospital located at  150 55th Street, Brooklyn, New York and is part of NYU.

9. Defendants herein, collectively and individually, are "employers" within the meaning of New York Labor Law § 741.

10.      Upon information and belief, Defendants NYU may sue and be sued, and are a healthcare network of hospitals that includes hospitals in Manhattan, Queens, Brooklyn, and Long Island, which NYU – Brooklyn is a part of, and NYU maintains its primary place of business at 550 First Avenue, in New York.


**JURISDICTION & VENUE**


11.     This  Court  has  diversity  jurisdiction  over  this  case  because  (1)

Plaintiff resides in the State of Arizona and Defendants are all headquartered in the State of New York with their principal places of business in New York; and; (2) the damages to which Plaintiff is entitled exceed $75,000 due to his lost pay and benefits, and other consequential damages arising from his retaliation and defamation claims.

12.      Venue is proper in the Southern District of New York pursuant to 28 USC §1391(b), as Defendants  New York University, NYU Langone Hospitals, NYU Langone Health System, NYU Langone Medical Center, NYU School of Medicine,  NYU Medical Center,  NYU Hospital Center are residents of this District.


**FACTUAL BACKGROUND**


13.      Dr. Mason earned his medical degree from the Ross University School of Medicine, in Portsmouth, Dominica.  Thereafter, he did his Residency program in Internal Medicine, at the State University of New York, in Brooklyn, New York.   Dr. Mason then was a Clinical Fellow, in the Division of Pulmonary & Critical Care, at the University of Chicago, in Chicago, Illinois.

14.      In July 2016, Dr. Mason commenced employment as Clinical Instructor of Medicine, Division of Pulmonary, Critical Care and Sleep Medicine,

with Defendants NYU, predominantly working at the NYU - Brooklyn location.

15.     At that time, Dr. Ravindra Rajmane, was the Chief of Pulmonary and Critical Care Medicine at the NYU – Brooklyn, Dr. Mason's direct supervisor, and had supervisory authority over all of the physicians in the Division of Pulmonary, Critical Care and Sleep Medicine and the ICU units, as well as the Pulmonary Consultation services provided at NYU - Brooklyn.

16.     A few months after Dr. Mason's commencement of employment with NYU, Dr. Rajmane gave Dr. Mason the leadership position of "Moderator of Morbidity and Mortality," wherein each week the Medical Residents ("Residents') at the hospital would present the deaths and/or cases that had clinical concern that occurred in the ICUs, and Dr. Mason would then lead a discussion to assess if medical errors occurred, if standards of care were adhered to, and if there were areas of improvements to present and discuss.

17.     Dr. Rajmane also appointed Dr. Mason to be a Committee Member of the Occurrence Review Committee, and was the sole designated representative for the section of the Medical Critical Care, wherein weekly interdisciplinary meetings would be held with the Chief Medical Officer and/or the Vice President of the Quality and Safety section of the Hospital.  During these meetings, Dr. Mason, as the chosen representative of Medical Critical Care, would review all concerning cases in that section and identify potential errors and, if needed, recommend their

nomination for an empaneled root cause analysis in order to improve patient care at NYU – Brooklyn.  Other committee designees were present from Surgery, Surgical Critical Care, Neuro Critical Care, Internal Medicine and Family Practice.

18.     On or about November 2016, during a bi-weekly faculty meeting, Dr. Rajmane began uncontrollably screaming at another physician within Dr. Rajmane's department, demeaning her and her work, and, while in close physical proximity, screaming in her face.  Dr. Mason demanded that Dr. Rajmane cease his screaming and stood in between Dr. Rajmane and the other physician to protect her from Dr. Rajmane.

19.     After that incident, Dr. Mason complained to Dr. Daniel Sterman (hereinafter referred to as "Dr. Sterman"), the Director of the Division of Pulmonary, Critical Care and Sleep Medicine NYU Langone Hospital, who upon information and belief was Dr. Rajmane's supervisor, about Dr. Rajmane's erratic and unstable behavior during the meeting, as well as more generally Dr. Rajmane's unstable leadership as section Chief.

20.     Dr. Mason's position as Clinical Instructor of Medicine, required that he instruct, train, and critique the Residents assigned to him in NYU's residency program.

21.     Upon information and belief, every Board Certified Internal Medicine physician must go through a Residency program prior to being able to practice

medicine independently.

22.     There were approximately five (5) Residents out of a group of approximately thirty (30) Residents who caused Dr. Mason concern, as they consistently made decisions that were dangerous to patient safety and Dr. Mason had a good faith reasonable belief that these Residents were performing at the Critical Deficiencies level defined by American Board of Internal Medicine Milestones.

23.     Dr. Mason suggested that these particular Residents be disciplined and/or undergo retraining.

24.     On or about April 21, 2017, Dr. Mason complained to both Dr. Frank M. Volpicelli (hereinafter referred to as "Dr. Volpicelli"), Chief of Medicine at NYU – Brooklyn and Dr. Jeanne Carey, Internal Medicine Program Director at NYU – Brooklyn, that the Residents in question were not communicating all relevant clinical information regarding patients, which was jeopardizing patient safety and care.

25.     In one such instance, one of the Residents whom Dr. Mason expressed concern about, had evaluated a patient whose primary physician sought a critical care consultation for the patient.  The Resident thereafter presented her findings to Dr. Mason to discuss the care of the patient.  However, instead of completing the work on that patient, including medical orders and documenting the plan of care

and physical findings, this Resident left and passed off the patient to the incoming Resident without providing pertinent information, and as such, the incoming Resident did not have the ability to properly treat this patient or discuss the patient adequately with Dr. Mason, which Dr. Mason believed was a serious threat to this patient's safety.

26.     On or about May 10, 2017, Dr, Mason raised several concerns with Dr. Rajmane over the performance of certain Residents who caused him concern, including their failure to perform tasks independently and competently.

27.     On or about May 10, 2017, Dr. Mason expressed concern to Dr. Rajmane about a Resident treating a patient who was hemorrhaging blood from his gastrointestinal tract; the Resident failed to comprehend that the patient should be given blood, and thus failed to give the patient blood, although at this stage of her Residency, she should have known to give blood to the patient based on the circumstances, and her failure to do so clearly put the patient at great risk.

28.     On or about May 10, 2017, another Resident was to remain in the ICU all night because she had a patient who was hemodynamic, which required the Resident to provide continuous attention, but the Resident was nowhere to be found even though Dr. Mason attempted to contact her for an extended period of time without any response.

29.     That same evening, this particular Resident also had a patient who

was in acute kidney failure, and as part of the routine general management the Resident was tasked with ensuring that the patient had a Foley catheter placed to obtain a urine specimen and to measure the patient's urine output. However, this Resident did not take the necessary requisite steps, and did not take the initiative to contact Dr. Mason or the Urologist, to adequately treat the patient, which could have resulted in irreparable kidney damage.

30.     There were a number of instances involving the aforementioned Residents, and Dr. Mason expressed his concerns about them to Dr. Rajmane. However, despite these serious nature of Dr. Mason's complaints, neither Rajmane nor NYU provided additional training or any type of discipline to these Residents.

31.     On or about May 31, 2017, when Dr. Mason met with Dr. Rajmane, Dr. Rajmane warned Dr. Mason that several of the Residents were "untouchable" because they were related to important people within NYU's administration, and if Dr. Mason continued to express concerns about these Residents, he would have a "bullseye on his back."

32.     Dr. Mason was obviously uncomfortable hearing this statement from Dr. Rajmane and reasonably believed that, in addition to the concerns stemming from the conduct of the Residents, Dr. Rajmane's own erratic behavior, refusal to promote patient safety, and lack of competence as department Chief jeopardized patient safety and care.

33.     Dr. Mason then contacted NYU's Human Resources department in an effort to report his concerns about Dr. Rajmane and obtain assurances that he was not going to be retaliated for reporting his concerns, and he scheduled a meeting with Evelyn Taveras ("Ms. Taveras"), the Manager of Employee & Labor Relations at NYU's Human Resources.

34.     On or about June 2, 2017, Dr. Volpicelli sent an email to Dr. Mason, seeking to have a meeting regarding "constructive feedback" that he had for Dr. Mason, and also stating that Dr. Mason was "a great doc doing a great job, but want[ed] to go over a few things.  Not punitive at all."

35.     Dr. Mason responded to Dr. Volpicelli's email and stated that he "welcomed the feedback" and also wanted to use this meeting to discuss the concerns that he continued to have regarding Dr. Rajmane.

36.     On or about June 5, 2017, Dr. Mason met with Ms. Taveras, wherein he discussed his concerns regarding Dr. Rajmane's erratic, unpredictable and strange behavior, and also discussed the fact that he felt uneasy and afraid that he would be retaliated against, due to his complaints regarding Dr. Rajmane's behavior, as well as Dr. Rajmane's leadership of his department.

37.     On or about June 9, 2017, Dr. Mason had another meeting with Dr. Sterman.   During that meeting, Dr. Mason discussed the possibility of being transferred to NYU's Manhattan location and also discussed Dr. Rajmane's lack of

leadership within the department and his erratic behavior, which was a deviation from the standard for someone with the positon of Section Chief of the Pulmonary, Critical Care and Sleep Medicine NYU Langone Hospital – Brooklyn.  However, Dr. Sterman did not want to continue to discuss Dr. Rajmane and stated that he did not want to "get granular," indicating that he wanted Dr. Mason to cease his complaints regarding Dr. Rajmane.

38.      As such, Dr. Sterman took no action and did not investigate Dr. Rajmane after this meeting, although Dr. Sterman did admit that Dr. Rajmane was probably not the best qualified candidate for the job as Chief of the department. However, no changes were made by NYU.

39.      Since it was clear to Dr. Mason that Dr. Rajmane was ignoring his concerns regarding the Residents endangering the lives of the patients at NYU - Brooklyn, Dr. Sterman was ignoring Dr. Mason's concerns regarding Dr. Rajmane's unpredictable conduct and his flawed leadership over the department, and Dr. Mason reasonably believed that there was a threat to patients' safety at the hospital, on or about June 13, 2017 at or about 6:04 p.m., Dr. Mason emailed Monica Vidaurrazaga, Medicine Chief Resident, as well as Dr. Carey, Internal Medicine Program Director, about his concerns.

40.      In Dr. Mason's June 13, 2017 email, Dr. Mason stated that he encountered "several issues regarding Residents' performances…" that day and

listed some of the issues that he encountered regarding the Residents stating that the "above issues affect patient care and are very concerning…"  He ended this email by stating "PLEASE HELP."

41.     On June 13, 2017, at approximately 10:51 p.m., Dr. Rajmane sent an email to Dr. Mason and his colleagues, ending with a comment that he is having a party to celebrate "a solid year with exceptional care."

42.     However, upon information and belief, after Dr. Mason's email was forwarded to Dr. Rajmane, that same evening, at or about 11:44 p.m., Dr. Rajmane sent an email to Dr. Mason's colleagues , Dr. Jorge Mercado ("Dr. Mercado") and Dr. Tshering Amdo ("Dr. Amdo"), stating that there had been complaints regarding Dr. Mason by the Senior Director of Nursing.  Dr. Rajmane ended his email by stating, "…. if the Residents fall short, I think it is my failure to communicate priorities to them….",  but failing to address any of Dr. Mason's concerns.

43.     After Dr. Rajmane's email was forwarded to Dr. Mason, Dr. Mason approached the Senior Director of Nursing who allegedly made the complaint regarding him, as Dr. Mason was unaware of any basis for such a complaint. However, Dr. Mason learned from the Senior Director of Nursing that the "alleged complaint" referenced by Dr. Rajmane had never occurred.

44.     Rather than addressing or remedying Dr. Mason's serious concerns

expressed in his email dated June 13, 2017, on June 14, 2017 at or about 1:42 a.m., in response to Dr. Mason's email, Dr. Rajmane sent an email to Dr. Mason and another physician working with Dr. Mason as a Critical Care & Pulmonology attending at NYU – Brooklyn, stating, "[t]here is a strong narcissistic tendency in medicine to think that one's input is essential to better outcomes . . . NYU Lutheran will be better as a part of NYU without our input. . . " He further stated that, "[t]he beauty of medicine is that few will get it. Again, since I will never have kids, I think of the residents and my fellows as my kids. Sometimes they will fall short, it's my job to model better practices. I don't know if my psychological ramblings make sense to you. More importantly, we have to fix our relationship with house staff. Let's talk further. Be kind to them."

45.     On June 14, 2017, at approximately 10.00 a.m., Dr. Mason met with Dr. Volpicelli to discuss the strange and erratic email that Dr. Rajmane sent in reply to Dr. Mason's concerns regarding the Residents and patient safety. During this meeting  Dr. Volpicelli admitted that he needed to "get rid of Ravi," referring to Dr. Rajmane. However, that never happened.

46.     On or about June 19, 2017,  Dr. Mason met with Dr. Volpicelli again. Dr. Volpicelli spoke with Dr. Mason regarding friction that Dr. Volpicelli was alerted to between Dr. Mason and some of the Residents. At the meeting, Dr. Mason notified Dr. Volpicelli that the friction was due to the fact that he

communicated that these particular Residents, about whom he had earlier communicated that these particular Residents, about whom he had earlier complained, were clearly endangering the lives of the patients at NYU –Brooklyn. However, Dr. Volpicelli's focus was less on the danger to patients and more on enrolling Dr. Mason in a course related to "resolving workplace conflict." Nevertheless, to appease his superior, Dr. Mason agreed to take the course.

47.     At that same meeting, Dr. Mason complained to Dr. Volpicelli regarding Dr. Rajmane's ongoing unpredictable, erratic and strange conduct, which concerned Dr. Mason, especially in light of the fact that Dr. Rajmane was the Chief of Pulmonary and Critical Care Medicine at NYU – Brooklyn, which was an extremely important position with very important responsibilities.

48.     After their meeting, on or about June 20, 2017, Dr. Volpicelli sent an email to Dr. Mason showing his support of Dr. Mason stating:  "I'm so happy Josh!  Your commitment to personal development will carry you!"

49.     Although Dr. Mason continued to complain to NYU's administration regarding Dr. Rajmane's erratic conduct, nothing was done, a clear indication NYU tolerated this behavior.

50.     On or about June 28, 2017, Dr. Mason met again with Dr. Sterman to discuss Dr. Rajmane's erratic behavior during Dr. Mason's performance evaluation.

51.     On or about August 2017, Dr. Mason treated a patient that he felt

required the expertise of a neuro-oncologist.  In order to best treat the patient, Dr. Mason consulted with a neuro-oncologist from NYU's Manhattan location, after the family approached Dr. Mason to discuss whether opportunities were missed for this patient.  Dr. Mason had reached out to the neuro-oncologist to see whether there were any other options of treatment for this patient.

52.    On or about September 7, 2017, Dr. Mason submitted a report on the Patient Safety Reporting System (PSI) regarding the conduct of a Resident whom Dr. Mason had complained about previously.  The Resident, was not following the established protocol for monitoring and treating the potassium level of a patient with aggressive diuresis, a condition which can cause potassium levels to fall to dangerously low levels.  Dr. Mason counseled this Resident on the dangers of not following these values, as the Resident's conduct could have caused a life threatening arrhythmia and cardiac arrest, and the Resident should have known to follow these levels consistently in order to augment the potassium levels when required, which was a clear danger to the patient.

53.    Upon information and belief, NYU did not properly discipline this Resident for conduct which clearly posed a grave threat to the patient's health and which occurred because of the Resident's failure to monitor the patient adequately.

54.    Dr. Mason's complaints of dangerous care to patients infuriated Dr. Rajmane, as well as others within NYU's administration.

55.     On or about August 23, 2017, Dr. Rajmane sent an email to Dr. Mason and other attending physicians in his department discussing hospital acquired infections, which Dr. Rajmane reminded the recipients was "publicly reportable data."  Dr. Rajmane further stated that the Chief Quality Officer at NYU Langone was implementing a "Zero Harm" initiative with the "ambitious goal of eliminating hospital complications, everyday and everywhere throughout our health system."

56.     Upon information and belief, as part of NYU's "Zero Harm" policy, all blood and urine cultures obtained in the ICU, had to be approved by the supervising physician, and could no longer be ordered by a Resident without first obtaining approval from an attending level physician.  This email also stated, "[p]lease avoid obtaining either culture if there is a known alternate source of infection," specifically directing that no culture be ordered by any physicians at NYU if the patient had any other known infection.

57.     On or about the end of August 2017, Dr. Mason approached Dr. Rajmane to discuss NYU's change in policy in not allowing Residents to order cultures, including blood and urine cultures of a patient, and complained that this would likely lead to more hospital related infections being unreported.  It appeared to Dr. Mason, and his fellow doctors, that it was done by NYU in order to find and report less hospital related infections.  Dr. Mason expressed his concern that this

was an unsafe practice.  Dr. Mason further expressed his opinion that NYU was attempting to downplay hospital acquired infections at NYU by imposing a policy wherein the hospital would take less cultures in order to find less infections.

58.     Dr. Mason expressed this concern that NYU's new policy would cause infections to be undetected to both his colleagues and to Dr. Rajmane.

59.     Dr. Mason's complaint was not addressed, although it was clear to Dr. Mason that this new policy would pose a danger to the health of NYU patients.

60.     On or about early September 2017, a patient was admitted to the NYU – Brooklyn location, and Dr. Mason became the attending physician for the patient when the patient was admitted to the ICU.  At that time, Dr. Joseph Weisstock, Chief Medical Officer, NYU – Brooklyn, (hereinafter referred to as "Dr. Weisstock") praised Dr. Mason in an email for elevating the patient's matter and further stating "[s]ounds like there were missed opportunities earlier in the course…." praising Dr. Mason's work with the patient.  Dr. Weisstock was clearly satisfied with the Dr. Mason's work at that time.

61.     On or about September 11, 2017 at or about 6:17 a.m., Dr. Mason sent an email to Dr. Rajmane, which he copied to Dr. Volpicelli and Dr. Charles Okumara, the Division Director of Hospital Medicine, notifying them that the attending physician, Dr. Chu, had been informed and declined to evaluate his patient when informed of a potential status change after the patient underwent a

surgical procedure.   Dr. Mason clearly believed, in good faith, that Dr. Chu's failure to evaluate his patient, was a danger to the patient's safety and wrote his email to Drs. Rajmane, Volpicelli and Okumara to inform them of this danger.

62.     That same day, Dr. Mason called Dr. Volpicelli to discuss the incident regarding Dr. Chu's refusal to come to the bedside of his patient.   During the conversation, Dr. Volpicelli stated that he was upset with how Dr. Mason phrased his medical note in the patient's chart when evaluating the patient, and he was angered that Dr. Mason refused to delete his medical note from the patient's records.

63.     Dr. Mason refused to delete a note that clearly documented what had occurred during his shift, which Dr. Mason reasonably believed was a threat to patient safety.

64.     On September 11, 2017, on or about 8:00 a.m., Dr. Volpicelli, clearly upset with Dr. Mason, sought that Dr. Mason effectively and retroactively change the patient's medical records and take out the portion in the records stating that Dr. Chu refused to come to the bedside of his patient, although the patient's status had changed, which warranted that Dr. Chu see his patient to evaluate him.

65.     By September 11, 2017, 2:08 p.m., when Dr. Mason was sleeping and after being on call working at NYU – Brooklyn for approximately seven (7) days straight, Dr. Rajmane sent Dr. Mason an email directing Dr. Mason to meet with

him and Dr. Volpicelli.

66.     On September 22, 2017, Dr. Rajmane sent an email to Dr. Mason and his colleagues stating that rather than notifying the administration at NYU, clinical problems should be "vetted by me and not escalated up the leadership ladder….I ask you to email, call, or text me about any clinical problems before escalating further. . . "

67.     Dr. Rajmane was clearly referring to Dr. Mason's complaints made to NYU's administration, relating to Dr. Mason's concerns regarding patient safety.

68.     After all of the complaints that Dr. Mason made to NYU's administration regarding the erratic conduct of Dr. Rajmane, it was apparent that NYU took no tangible action to look into Dr. Rajmane's conduct.   Instead, according to Dr. Rajmane's email dated September 22, 2017, NYU appointed an "executive coach" to work with Dr. Rajmane to be "a more effective section leader."

69.     By September 26, 2017, Dr. Mason was placed on a "Focused Professional Practice Evaluation Plan" ("NYU's Plan").  According to a letter from Dr. Volpicelli, Dr. Mason was placed on NYU's Plan based on "the collective decision was made by Dr. Volpicelli, Dr. Rajmane, Dr. Nunnally, Dr. Weisstuch and Dr. Sterman."

70.     As part of NYU's Plan, Dr. Mason was provided with alleged

incidents which purported to support NYU's placement of Dr. Mason on NYU's Plan.  Dr. Mason was able to clearly refute and did refute this alleged support on multiple occasions.  However, Dr. Mason was still placed on NYU's Plan, which was done in retaliation for his complaints of the very real dangers to patients.

71.     NYU's Plan referred to alleged incidents concerning Dr. Mason contributing to a "non-collaborative work environment and non-productive training environment for our trainees," which was unsubstantiated.  One of the instances referenced in NYU's Plan arose as a result of Dr. Mason referring a patient with a brain tumor to a neuro-oncologist, as set forth in Paragraph 51 of this Complaint, wherein Dr. Mason clearly made the proper decision based on the circumstances.

72.     Further, NYU's assertion that Dr. Mason was contributing to a "non-collaborative work environment" was belied by the fact that, just a few months earlier, Dr. Volpicelli had praised Dr. Mason for his "collaboration" with other physicians, stating that "meaningful change is led by a small group of providers who are unsatisfied with the status quo, and you all represent that, we are happy to have you as part of our solution."

73.     On September 27, 2017, Dr. Rajmane sent an email to Dr. Mason and the other attendings within his department stating as follows in pertinent part: "Finally, after dialog with other section leaders . . . I plead with you not to cc your issues to Medicine leadership without first texting or calling me or Tshering.  We

need to keep our own house in order. Emails/calls to leadership need to be strategic and coordinated, individual escalation raises flags and makes us all look pedestrian."

74.     That September 27, 2017 email continued to state: "Please recognize that each time one of us emails leadership asks for blanket reviews by expert faculty across river, or escalates inchoate policies that have been discussed with PCCM leadership dilutes our brand. Our grievance about weighty matters such as covering RRTs at night gets lost in complaints about residents or lapse sepsis surveillance."

75.     Dr. Rajmane's September 27, 2017 email was clearly targeting Dr. Mason in retaliation for his complaints and conduct as it related to patient safety. For some reason, Dr. Mason consulting with a Neuro-oncologist at NYU's Manhattan location was somehow a problem, although this was clearly done in order to provide the best care for the patient suffering from a brain tumor, and Dr. Mason's complaints about Residents and sepsis surveillance was something Dr. Rajmane was clearly bothered by, and stated that it should not be discussed with anyone from the administration, although Dr. Rajmane himself made no attempt of any kind to remedy matters affecting the safety of patients. Instead, the only thing that Dr. Rajmane wanted was to stop Dr. Mason from continuing to make complaints.

76.     As such, although Dr. Mason made a number of complaints regarding patient safety, these complaints were ignored, and patients' safety and lives continued to be at risk.  Dr. Rajmane was directing Dr. Mason to cease reporting any patient safety danger to NYU's administration, and Dr. Volpicelli disregarded all of Dr. Mason's complaints about patient safety as well, and instead asked Dr. Mason to delete his notes from a patient's medical record in order to protect a physician, Dr. Chu, who refused to come to a patient's bedside.

77.     Four days after being placed on NYU's Plan, and three days after being directed by Dr. Rajmane to stop complaining to NYU's administration, on or about September 30, 2017, Dr. Mason was the attending on call for the ICU, and was also providing consultation services to the emergency room ("ER") and General Medical Floors ("GMF").  There were approximately twenty to twenty-five (20-25) patients already in the ICU that evening and approximately six to eight (6-8) new patients admitted to the ICU.  Assisting Dr. Mason were two Residents. This was a particularly busy night where the ICU received in excess of eight (8) consult requests whereas a typical night consisted of three to four (3-4) such requests.

78.     Around three (3) a.m. that evening, Dr. Mason received a call from one of the Residents, (a Resident that Dr. Mason had complained about previously to Dr. Rajmane and Dr. Carey), wherein the Resident stated that there was a patient

on the GMF going through alcohol withdrawal.  Dr. Mason advised the Resident to admit the patient directly to the MICU and provided the Resident with initial management guidance for this patient.

79.     Defendant NYU has an established algorithm (procedure) for alcohol withdrawal that all Residents should be aware of, and the protocol includes escalating doses of benzodiazepines, followed by barbiturates, consideration of precedex (a medication) and then, if needed, intubation and propofol infusion (another medicine).

80.     The Resident advised Dr. Mason that she was following protocol with this patient, and had continued to keep Dr. Mason apprised of the patient's condition.

81.     After the initial call with the Resident that evening, Dr. Mason spoke to this Resident on the phone again, guiding her on her questions regarding management of all the patients, including the patient going through alcohol withdrawal.  Dr. Mason was always available to both the Residents on call that evening by phone - he was physically at NYU – Brooklyn that evening, and he was physically nearby at all times.

82.     At approximately five a.m. (5 a.m.), Dr. Mason received a call from the charge nurse in the MICU, who told Dr. Mason that he was concerned over the Resident's inability to manage the patient that was going through alcohol

withdrawal.  Within approximately five minutes (5 minutes) of the call, Dr. Mason went to the patient's bedside.  After Dr. Mason came to the patient, the patient still had a moderate degree of agitation.  However, within several minutes the patient became calm and subdued, whereby the protocol followed that evening proved to be effective, so that Dr. Mason essentially did not have to change anything than what was already being done for this patient earlier in the evening.

83.     However, NYU terminated Dr. Mason's employment and claimed that on September 30, 2018, Dr. Mason failed to respond to this patient going through alcohol withdrawal in a timely manner.  By October 10, 2017, Dr. Mason was informed that his employment was terminated from NYU "for cause."

84.     NYU's reasoning for terminating Dr. Mason's employment was contradictory and Dr. Mason's termination was pretext for his multitude of complaints regarding patient safety and his refusal to delete pertinent information from a patient's medical record.

85.     On September 30, 2017, Dr. Mason responded adequately and appropriately, following NYU's protocol to the letter for the patient who was going through alcohol withdrawal, and when Dr. Mason came to the patient's bedside, Dr. Mason did not have to do anything for the patient, since the protocol followed that evening had proven to be effective.

86.     On or about October 26, 2017, within sixteen (16) days of being

terminated, and in compliance with NYU's Grievance Policy requiring the submission of a grievance "within 30 days of the decision that is the basis for the grievance," Dr. Mason initiated a grievance process.

87.     Further, although the time for Dr. Mason to submit his grievance to NYU had not yet lapsed, upon information and belief, approximately two weeks after NYU terminated Dr. Mason's employment, NYU filed a report with the Office of Professional Medical Conduct ("OPMC"), claiming that Dr. Mason failed to respond to a patient in a timely manner, a statement that is blatantly false.

88.      Thereafter, Dr. Mason requested that NYU change their decision to terminate his employment and withdraw their report to OPMC.

89.     However, although Dr. Mason was able to refute all of the allegations that NYU claimed led to his termination, NYU refused to reinstate Dr. Mason to his position.

90.     On or about January 10, 2018, Dr. Mason met with Dr. Steven B. Abramson ("Dr. Abramson"),  Sr. Vice President & Vice Dean of Education, Faculty and Academic Affairs at NYU, who thereafter issued a decision that Dr. Mason's conduct "posed a risk to at least one of our patients" and came to the conclusion that Dr. Mason's termination "for cause" "was justified on the merits."

91.     In his decision, however, Dr. Abramson admitted that Dr. Mason had expressed "concerns" at NYU, although Dr. Abramson failed to give any details

regarding Dr. Mason's concerns.  In addition, Dr. Abramson failed to mention that he was both the person terminating Dr. Mason's employment and thereafter presiding over and issuing the final decision as to Dr. Mason's grievance regarding the propriety of his termination.  Essentially, Dr. Abramson was the judge, jury and appellate court in this process.

92.     Defendants' claim that Dr. Mason was terminated for failure to respond to a patient in a timely manner was pretextual, as was the NYU Plan that Dr. Mason was placed on by NYU on September 26, 2017, as both actions were taken in retaliation for Dr. Mason's complaints regarding patient safety, including complaints made to NYU relating to the erratic conduct of the Chief of the department, Dr. Rajmane, heading the important ICU department at NYU – Brooklyn, complaints regarding Residents putting the lives of patients in danger, complaints regarding NYU's new policy to reduce the testing of cultures in NYU so to present a lower number of hospital-acquired infections while allowing patient infections to go undetected, as well as Dr. Mason's refusal to alter the medical records contained in a patient's chart, documenting the fact that the attending physician of the patient, Dr. Chu, had failed to come to his patient although he was called after the patient had a change in status.

93.     After Dr. Mason was terminated from his employment, Dr. Rajmane continued to act in an erratic manner, advising Dr. Mason that he wanted to help

and meet with him to discuss future job prospects.  Thereafter, he would cancel the meeting.

94.     Dr. Mason's concerns related to Dr. Rajmane's erratic behavior were revealed to be well-founded, as months after Dr. Mason's termination, according to a *New York Daily News* article dated December 13, 2017, Dr. Rajmane was found dead in his Manhattan home from a suspected overdose of heroin called 'Knock Out King.'" At the time of his death from an apparent heroin overdose, Dr. Rajmane was still the Chief of Pulmonary & Critical Care Medicine at NYU – Brooklyn. *See http://www.nydailynews.com/new-york/doctor-found-dead-nyc-home-apparent-heroin-overdose-article-1.3695966*

95.     After so many complaints that Dr. Mason made regarding Dr. Rajmane's erratic behavior, NYU never investigated this behavior, and instead terminated Dr. Mason's employment.

## AS AND FOR PLAINTIFF'S FIRST CAUSE OF ACTION
### Retaliation in Violation of New York Labor Law §741

96.     Plaintiff repeats and realleges the allegations of the foregoing paragraphs as if fully set forth herein.

97.     Defendants' acts and/or omissions were willful and constitute a

flagrant, bad faith violation of New York Labor Law § 741.

98.     At all relevant times, Dr. Mason was a physician licensed to practice medicine in the State of New York who was employed by Defendants and performed health care services for and under the direction and control of Defendants within the meaning of New York Labor Law § 741.

99.     At all relevant times, Defendants employed Dr. Mason, and upon information and belief were partnerships, associations, corporations and/or agents that provided health care services as defined by Labor Law § 741 (1) (b) and (c).

100.    The conduct about which Dr. Mason complained to NYU and their agents and employees constituted a significant threat to the health of specific NYU patients.

101.    In response to Dr. Mason's complaints of improper and unsafe activity involving the conduct of the Residents, Dr. Rajmane ignored Dr. Mason's complaints, and thereafter, when Dr. Mason complained to Dr. Volpicelli, Dr. Sterman, and Human Resources at NYU, regarding Dr. Rajmane, those complaints were also ignored.  Thereafter, Dr. Mason found himself on NYU's Plan and shortly thereafter was terminated from his employment for false and pretextual reasons.

102.    Further, Dr. Mason also disclosed the erratic conduct of Dr. Rajmane on several occasions to Dr. Volpicelli and Dr. Sterman because he reasonably

believed, in good faith, that Dr. Rajmane's behavior constituted improper quality of patient care.

103.    Dr. Mason also complained to Dr. Rajmane and Dr. Carey regarding the conduct of a number of Residents that Dr. Mason in good faith reasonably believed posed a danger to patient safety.

104.    Further, Dr. Mason reasonably believed, in good faith, that Dr. Rajmane's behavior constituted improper quality of patient care.

105.    Dr. Mason also refused to change a patient's medical records and delete information wherein Dr. Mason documented that the patient's treating attending physician failed to come his patient's bedside when he was called and when the status of the patient had changed, which required the attending physician to evaluate this patient.

106.    Defendants engaged in retaliatory personnel action when Dr. Mason was first placed on NYU's Plan and further engaged in retaliatory action when Dr. Mason was terminated for making disclosures of improper conduct occurring at NYU, that Dr. Mason reasonably believed in good faith to be improper and to constitute improper quality of patient care.

107.    By reason of NYU's retaliatory discharge of Dr. Mason, Dr. Mason has suffered and is entitled to compensatory damages.

108.    By reason of NYU's  retaliatory discharge of Dr. Mason, Dr. Mason

has suffered and is entitled to exemplary punitive damages.

109.    Defendants jointly employed Plaintiff.

110.    Plaintiff provided health care services and is an "employee" as defined by § 741.

111.    On multiple occasions, the Plaintiff disclosed to his supervisors and administrators, in good faith, what he reasonably believed constituted improper quality of patient care.

112.    Plaintiff further rejected and/or refused to participate in any activity, policy or practice of the employer that the Plaintiff, in good faith, reasonably believes constitutes improper quality of patient care and refused to delete pertinent medical records from a patient's file documenting Dr. Chu's refusal to come to the patient when Dr. Chu was called when the patient's status had changed, and Dr. Mason in good faith reasonably believed that changing and deleting information from the patient's medical records, constituted improper quality of patient care and was a threat to this patient's safety.

113.    The Plaintiff herein had a good faith and reasonable belief that various activity, policy, or practice of the Defendants constituted improper patient care.

114.    Plaintiff was subjected to retaliation for his engaging in the foregoing conduct, to wit, his termination of employment.

115.    Plaintiff did disclose or threatened to disclose an activity, policy, or

practice of the Defendants to a supervisor or a public body.

116.    Plaintiff, in good faith, reasonably believed that the activity, policy, or practice constituted a violation of a law, rule, regulation, or declaratory ruling adopted pursuant to law.

117.    The violations that the Plaintiff complained about presented either a substantial and specific danger to public health or safety or a significant threat to the health of a specific patient.

118.    Although the Plaintiff continued to complain, nothing was done to remedy the practice of the Defendants.

119.    In response to Plaintiff's complaints, NYU would either ignore his complaints, or he would be told by Dr. Rajmane to cease his complaints to NYU's administration, however, no real solution was taken by NYU to protect or improve the quality of patient care or to remedy those problems that Dr. Mason complained caused a significant threat to patient safety.

120.    When the Plaintiff complained about Dr. Rajmane's erratic behavior, nothing meaningful was done by NYU.

121.    NYU's practices and failure to remedy policies and practices that were harmful to patient care, violated various statutes, rules, and regulations.

122.    The articulated basis for NYU's termination of Dr. Mason, wherein NYU claimed that Dr. Mason failed to respond to a patient in a timely manner, was

false, and was pretext for his termination.

123.    No other NYU employee was disciplined as a result of the incident that NYU claimed led to Dr. Mason's termination.  Further,  ironically, it was only within weeks after Dr. Mason complained about Dr. Chu's failure to come to the bedside of a patient, that NYU terminated Plaintiff's employment, and Dr. Chu was never terminated from his employment, and instead Dr. Volpicelli demanded that Dr. Mason delete information related to the incident involving Dr. Chu from the patient's medical record.

124.    The Plaintiff herein reasonably believed in good faith that the improper quality of patient care that he had been complaining about, that he reported to his Supervisor, Dr. Rajmane and which he complained about to physicians that were part of NYU's  administration, Dr. Sterman and Dr. Volpicelli, presented an imminent threat to public safety and/or to the health of a specific patient.

125.    It is further alleged NYU's violations of regulations that pertain to patient safety are also violations of rules administered by the Department of Health, Joint Commission, and other pertinent rules and regulations.  Since these violations directly impact patient safety, NYU's conduct could further result in medical malpractice claims against NYU, which constitutes a further violation of New York State law.

126.    The Defendants retaliated against Dr. Mason for complaining about serious safety violations at NYU that constituted a violation of New York State laws, rules, and regulations.

127.    Plaintiff also protested the invitation to participate in NYU's policy of not allowing Residents to order cultures of patients, that Dr. Mason reasonably believed posed a danger to the health and safety to members of the public, including the patients at NYU, that would result in improper quality of patient of the NYU, and NYU – Brooklyn in particular.

128.    Plaintiff's complaints were ignored, and taken as an affront by NYU.

129.    Based on the foregoing acts and/or omissions, Defendants have violated plaintiff's rights under Labor Law § 741 by retaliating against him for disclosing improper quality of patient care.

## AS AND FOR PLAINTIFF'S SECOND CAUSE OF ACTION
## of DEFAMATION PER SE AND LIBEL

130.    Plaintiff repeats and realleges the allegations of the foregoing paragraphs as if fully set forth herein.

131.    Plaintiff seeks to recover damages for defamatory statements made by NYU to the OPMC within approximately two weeks after NYU terminated Plaintiff's employment and prior to the expiration of time to file a grievance

stemming from Dr. Mason's termination.

132.   Upon information and belief, the claims made in NYU's report to the OPMC that Plaintiff was terminated for failing to timely respond to a patient were false, defamatory and injurious to Dr. Mason's professional reputation and are not privileged or protected by any privilege because the statements are false and known by NYU to be false, the statements were defamatory as a matter of law, the representations made by NYU were made as a matter of fact that falsely portrayed Dr. Mason's professional conduct, the statements were motivated by actual malice, and were made with deliberate intent to injure Dr. Mason and/or the statements were made with a wanton and reckless disregard of the statements' truth and their injurious effect upon Dr. Mason.

133.   Upon information and belief, NYU knew or was culpably reckless in not knowing that the statements made to the OPMC were false.

134.   Upon information and belief, the defamatory statements made by NYU to the OPMC falsely taint and permanently damage Dr. Mason's professional reputation and are Defamatory Per Se.

135.   Upon information and belief, NYU's report to the OPMC claiming that Dr. Mason failed to respond to a patient in a timely manner, was false and unsubstantiated.

136.   Upon information and belief, NYU's statements therefore improperly

imputed professional misconduct to Dr. Mason in regard to his treatment, judgment and care of a particular patient.

137.     Upon information and belief, the defamatory statements by NYU about Dr. Mason are not protected by any privilege because the statements are false, are known by NYU to be false, and were made with reckless disregard and actual malice.

138.     The Plaintiff has sustained damages as a result of NYU'S conduct.

139.     The Plaintiff herein has suffered economic damages, out of pocket damages, impairment of reputation, damages to Plaintiff's standing in the community, personal humiliation and mental anguish and suffering.

140.     Upon information and belief, NYU sent a report to the OPMC, which is a publication of a libel statement to a third party.

141.     The Plaintiff had no control of the publication to the OPMC.

142.     Upon information and belief, these words were false and defamatory and NYU knew that they were false and defamatory when NYU put these words in writing and when they published these words to the OPMC.  These words were written and/or spoken willfully and maliciously and with intent to injure Dr. Mason's good name, reputation and emotional well-being.

143.     Upon information and belief, NYU decided to report Dr. Mason to the OPMC although the time for Dr. Mason to initiate a grievance had not expired.

144.     Upon information and belief, by deliberately reporting Dr. Mason to the OPMC for failure to report to a patient in a timely manner, and not reporting Dr. Chu to the OPMC, but rather seeking that Dr. Mason delete information on a medical record, documenting Dr. Chu's refusal to come to his patient when asked and when the patient's status had changed, NYU has acted maliciously, willfully and intentionally in fabricating circumstances relating to Dr. Mason, and such report made to the OPMC is false and injurious and is Defamatory *Per Se*.

## AS AND FOR PLAINTIFF'S THIRD CAUSE OF ACTION
## SELF-PUBLICATION DEFAMATION

145.     Plaintiff repeats and realleges the allegations of the foregoing paragraphs as if fully set forth herein.

146.     Dr. Mason has a duty to mitigate his damages as a result of his termination and has attempted to attain gainful employment comparable to his former employment with NYU.

147.     Dr. Mason has applied for employment in a comparable institution and has been denied employment based on the fact that Dr. Mason had to disclose the fact that he was terminated, explain the circumstances of his termination, and the purported basis for NYU's reporting  of Dr. Mason to the OPMC.

148.     In providing prospective future employers with this information, the Plaintiff has been compelled and will be compelled to publish the false and defamatory statements made by NYU with regard to the fact that Dr. Mason had been terminated for his failure to respond to a patient in a timely manner and that Dr. Mason had been terminated "for cause."

149.     By having to reveal such information, which Dr. Mason disputes, Dr. Mason has been humiliated and has suffered significant pain and mental anguish.

150.     This defamation claim is best seen as one for self-publication, wherein a Defendant is liable if it knew or could have foreseen that the Plaintiff would be compelled to repeat the defamatory statement.

151.     NYU knew or could have foreseen that the Plaintiff was likely to be compelled to repeat NYU's defamatory statement, as Dr. Mason, a physician licensed to practice medicine, would be asked by a prospective employer, as well as by a State Medical Licensing Agency in order to renew his medical license, whether he was terminated and the reasons given therefor, and/or whether he was reported to the OPMC.

152.     In order to apply for positions at medical institutions and in order to renew his medical license in New York and Illinois, Dr. Mason has been compelled to repeat NYU's defamatory statement.

153.     NYU is liable for the foreseeable republication of the defamatory

statement, where herein there is a strong causal link between the actions of the originator Defendants and the damage caused by the republication, it was foreseeable that the republication would be made by the defamed Plaintiff, operating under the strong compulsion, as this information must be shared by a physician licensed to practice medicine, and therefore he must republish the defamatory statement, and the circumstances which create the strong compulsion to self-publish are known to the originator of the defamatory statement, the NYU Defendants, at the time of their communication of the defamatory statement.

154.    Further, the Plaintiff has no reasonable means of avoiding publication of the statement or avoiding the resulting damages, and NYU was aware that the defamatory statement must be reported by the Plaintiff, and the Plaintiff clearly has a lack of control over the publication.

155.    Actual malice is alleged herein, as NYU knew that the defamatory statement was false or made it with reckless disregard for its truth or falsity.

156.    Further,  NYU made the defamatory statement which Plaintiff was foreseeably compelled to self-publish, because it maliciously and spitefully wanted to injure the Plaintiff.

157.    In light of the foregoing, Defendants are liable to Dr. Mason for the tort of "compelled self-defamation."  As a result, the Plaintiff has not been able to obtain comparable employment and has suffered, and will continue to suffer

significant economic and non-economic damages.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Defendants as follows:

a. An injunction prohibiting Defendants' continued violation of law;

b. accept jurisdiction over this matter;

c. empanel a jury to try this case;

d. Direct Plaintiff's reinstatement with all fringe benefits and seniority rights, if any, back pay and benefits, and award compensatory damages in an amount to be determined at trial, all of which exceed $75,000; and

e. A fine of ten thousand dollars fine for bad faith retaliatory action pursuant to Law § 740(4)(d);

f. Punitive damages for defamation committed with malice;

g. Plaintiff's attorney's fees and costs; and

h. Such other and further relief as to this Court shall deem just and proper, together with the costs and disbursements of this action.

Dated:  June 28, 2018
             New York, New York

Respectfully submitted,

*Maya Risman*

Maya Risman
RISMAN & RISMAN, P.C.
30 Vesey Street – Sixth Floor
New York, New York 10007
(212) 233-6400
*Counsel for Plaintiff*
*MR6195*

*Christopher Watkins*

Christopher D. Watkins
WATKINS LAW
5 Paradies Lane
New Paltz, NY 12561
(845) 419-2250
*Counsel for Plaintiff*
*CW2240*